# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| BORIS MUDD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:07-CV-00304 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Boris Mudd appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion.

## I. PROCEDURAL HISTORY

Mudd applied for DIB and SSI on April 19, 2004, alleging that he became disabled as of September 30, 1994.[2] (Tr. 12.) The Commissioner denied his application initially and upon reconsideration, and Mudd requested an administrative hearing. (Tr. 30-40, 332-39.) A hearing was conducted by Administrative Law Judge (ALJ) Steven J. Neary on December 13, 2006, at

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Mudd's date last insured for DIB was December 31, 2004. (Tr. 57.)

which Mudd, who was represented by counsel; Joyce Herns, Mudd's friend; and a vocational expert ("VE") testified. (Tr. 342-64.)

On June 7, 2007, the ALJ rendered an unfavorable decision to Mudd, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 12-18.) The Appeals Council denied Mudd's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-8.) Mudd filed a complaint with this Court on November 29, 2007, seeking relief from the Commissioner's final decision. (Docket # 1.)

## II. MUDD'S ARGUMENTS

Mudd alleges two flaws with the Commissioner's final decision. Specifically, Mudd claims that (1) the ALJ failed to properly evaluate the credibility of his testimony of debilitating limitations; and (2) the ALJ failed to incorporate into the RFC all of the mental limitations he found in the application of the psychiatric review technique. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 8-12.)

## III. FACTUAL BACKGROUND[3]

### *A. Background*

At the time of his date last insured for DIB, Mudd was fifty-one years old and a veteran; had completed the ninth grade and obtained his GED; and possessed work experience as a molder and assembler. (Tr. 57, 106, 117.) Mudd alleges that he became disabled due to osteoarthritis and depression. (Opening Br. 2.) Mudd challenges the findings of the ALJ only in regard to his mental impairments (Opening Br. 2 n.1); therefore, we will focus on the evidence

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 364-page administrative record necessary to the decision.

2

pertaining to Mudd's mental limitations.

At the hearing, Mudd testified that he could not go back to work because he "[c]an't deal with the stress," stating that he just wants to be by himself and avoid being around other people. (Tr. 346, 350.) He explained that he would have difficulty working with others, the public, or supervision like he had at his last employer. (Tr. 350-54.) He testified that "some days" he didn't want anyone to say anything to him; when asked how often, he replied "every other day." (Tr. 355.) He testified that he takes medication for his "stress" and experiences side effects of fatigue, stating that he "sleep[s] a lot when [he] take[s] the pills." (Tr. 347.) Mudd explained that his typical day involves watching television; he also stated that he at times drives a car, visits his mother, and does dishes. (Tr. 349-50.) His girlfriend also testified at the hearing and essentially corroborated Mudd's testimony, explaining that they had known each other for twenty years and had lived together the past two years. (Tr. 356.)

### B. *Summary of the Relevant Medical Evidence*

In October 1999, Mudd saw Dr. Larry Lambertson, a psychiatrist, and Vivian Hernandez, Ph.D., a psychologist, at Park Center for emergency assessments in two separate sessions. (Tr. 114.) Mudd reported that he had trouble sleeping; had complained of harassment and racial discrimination at work; and had made threats against his fellow employees. (Tr. 114, 116.) Mudd stated that he had walked off the job because he was afraid of losing control and hurting someone, explaining that he owned guns and if he went back to work "someone will be dead." (Tr. 117-18, 120.) On mental status exam, Mudd had no suicidal ideation, but was agitated and angry with poor eye contact; he showed poor judgment and minimal insight; his affect was anxious, angry, and labile; and his thought content was suspicious and blaming. (Tr. 118.) He

was assigned a diagnosis of major depressive disorder, single episode, moderate severity, and was prescribed antidepressants. (Tr. 115, 120.) Dr. Hernandez assigned Mudd a Global Assessment of Functioning (GAF) score of 50, while Dr. Lambertson assigned him a GAF of 40.[4] (Tr. 115, 120.)

Two weeks later, Mudd visited Dr. Mark O'Brien for a fitness for duty exam, reporting that he was being harassed by other employees and that if he was forced to go back to work he would "put a bullet in [himself] or someone at work that harassed [him]." (Tr. 108.) Mudd reported that he had been placed on anti-depressants four weeks earlier by Dr. Lambertson, but denied any prior history of depression or psychological problems. (Tr. 108.) Dr. O'Brien's impression was that Mudd was depressed and believed that Mudd should not return to his current workplace, questioning whether he could ever return there. (Tr. 108-09.)

Mudd saw Dr. Hernandez once more and Dr. Lambertson five more times after his initial appointments. (Tr. 111.) Mudd was discharged from Park Center in April 2000 after declining to schedule further appointments. (Tr. 111.) His discharge assessment showed a diagnosis of major depression without psychosis and a GAF of 50. (Tr. 111.)

Two years later, on March 7, 2002, Mudd went to the Veteran's Administration (VA) Hospital in Fort Wayne, complaining that he has experienced depression and anxiety since he

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

4

was in the army twenty-five years earlier. (Tr. 132, 157.)  He reported that he took Remeron for his depression in 1999 as prescribed by Dr. Lambertson, but that he discontinued it because he did not have the money to pay for it. (Tr. 132, 157.)  Mudd reported difficulty sleeping and a poor appetite, denied current suicidal intent, but admitted having thoughts of hurting people. (Tr. 133.)  Caroline Voors, a psychiatric nurse clinical specialist, diagnosed depression and assigned a GAF score of 60, indicating moderate symptoms. (Tr. 134.)  The following month Mudd told Ms. Voors that he was more relaxed after taking his prescribed Remeron but was sad regarding his most recent divorce. (Tr. 157.)  He reported that he was looking for a job. (Tr. 157.)

Another two years later, in April 2004, Mudd returned to the VA and was referred to the mental health clinic after complaining of depression. (Tr. 135-56.)  He reported that he had nightmares of being in combat, though he explained that he had never seen combat while in the military. (Tr. 135-36.)  He was diagnosed with dysthymia and assigned a GAF score of 60, indicating moderate symptoms. (Tr. 138.)

Two months later, in June 2004, Mudd went to the VA in Marion, Indiana, for a compensation and pension medical examination. (Tr. 228-31.)  He told the examiner that he quit taking Remeron in 2002 because he wanted to see how he would cope. (Tr. 230.)  Mudd also reported a history of psychiatric symptoms for the majority of his life and that he had "an episode of anger" at work in 1999, which led to his termination.[5] (Tr. 230.)  He stated that he was too traumatized from past racial harassment at work to hold a job, also admitting that he had a series of divorces relating to his anger issues. (Tr. 231.)  The examiner assessed that Mudd

---

[5] Curiously, Mudd told a different doctor at the VA that day that he quit his job in 1999 because "it was difficult for him physically." (Tr. 228.)

5

took "little or no blame or responsibility for the unpleasant things that have happened" to him. (Tr. 231.) The examiner was "not totally convinced" that Mudd had a full depressive disorder, stating that "the diagnostic criteria is most likely dysthmic disorder . . ." (Tr. 233.) He went on to diagnose personality disorder and assign a GAF score of 55, indicating moderate symptoms. (Tr. 233.)

In June 2004, J. Evans, Ph.D., reviewed the record on behalf of the state agency and opined that Mudd's mental impairments caused no restriction in activities of daily living, but did cause moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 215.) Dr. Evans concluded that Mudd's ability to work around others was limited but that he "retains the ability to perform simple repetitive tasks on a sustained basis without special considerations." (Tr. 221.) A second state agency psychologist later affirmed Dr. Evans's opinion. (Tr. 221.)

In January 2005, Mudd returned to the VA for physical complaints, and his history of dysthymia was noted to be "stable at present." (Tr. 296.) Two months later, Mudd complained to the VA of symptoms of post traumatic shock syndrome and depression, and requested medication to help him. (Tr. 293-94.) He stated that his past use of Remeron had been helpful but that he eventually discontinued it due to "feeling too sleepy and lazy." (Tr. 291, 293.) He was diagnosed with general anxiety disorder and depression NOS; prescribed Celexa; and assigned a GAF score of 65, indicating mild symptoms. (Tr. 291-92.)

In the remainder of his visits to the VA in 2005, Mudd asserted only physical complaints. (Tr. 281-90.) On January 25, 2006, however, Mudd visited his primary care physician at the VA and reported continuing anxiety and problems with sleep; Mudd's doctor referred him to a

6

mental health specialist for his "moderate to severe depression." (Tr. 278, 308-09.) Mudd did not show up for his mental health appointment. (Tr. 309.)

In March 2006, Mudd met again with Ms. Voors at the VA, stating that he stopped taking Celexa because he felt more depressed and had begun taking Doxepin, which made him feel more relaxed. (Tr. 275.) She agreed that he should continue the Doxepin. (Tr. 275.) Ms. Voors diagnosed depression and assigned a GAF score of 58, indicating moderate symptoms. (Tr. 275.)

Two months later, in May 2006, Mudd reported to Ms. Voors that he was "70% improved" but that he was still having nightmares. (Tr. 273-74.) She prescribed him a sleeping agent and assigned him a GAF score of 62, indicating mild symptoms. (Tr. 273-74.)

On August 10, 2006, Mudd underwent a psychiatric evaluation at the VA. (Tr. 268-69.) He reported that he currently was under minimal stress and rated his anxiety and depression as 70% improved. (Tr. 269.) He was assigned a diagnosis of depression NOS and a GAF of 62. (Tr. 270.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

8

whether the claimant is incapable of performing work in the national economy.[6] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On June 7, 2007, the ALJ rendered his opinion. (Tr. 12-18.) He found at step one of the five-step analysis that Mudd had not engaged in substantial gainful activity since his alleged onset date, and at step two that Mudd's osteoarthritis and affective disorder were severe impairments. (Tr. 14.) At step three, the ALJ determined that Mudd's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 14.) Before proceeding to step four, the ALJ determined that Mudd's testimony of debilitating limitations was "not entirely credible" and that he had the RFC "to perform simple, routine tasks at the light exertional level involving only occasional climbing, balancing, stooping, kneeling, crouching and crawling, but not involving contact with the public." (Tr. 15.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Mudd was unable to perform any of his past relevant work. (Tr. 17.) The ALJ then concluded at step five that Mudd could perform a significant number of jobs within the economy. (Tr. 18.)

---

[6] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

9

Therefore, Mudd's claim for DIB and SSI was denied. (Tr. 18.)

### C. The ALJ's Credibility Determination Will Be Remanded

Mudd contends that the ALJ erred when he discounted his credibility for failing to pursue regular medical treatment without first considering any explanations that Mudd provided that may explain his failure to seek regular treatment. Mudd's argument is persuasive.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

In reaching his credibility determination, the ALJ stated:

> The [medical] records show the claimant did not have consistent or regular follow-up for his back and knee problems. He was prescribed medication for pain at times, but his conditions were generally described as mild and recently described as stable. The care for his back and knee problems can be characterized as conservative. Regarding the claimant's depression, he was seen for treatment/counseling from time to time, but often stopped taking medication on his own. The claimant has been prescribed different medications over the years, but has not always followed recommendations in terms of taking medications as prescribed. The claimant also did not always attend recommended appointments for care.

(Tr. 16-17.) Thus, the ALJ rested his determination, at least in significant part, upon the fact that

Mudd had not pursued regular treatment or consistently taken medication.

Indeed, Social Security Ruling 96-7p states that a claimant's testimony may be less credible if "the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." However, it further cautions that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment *without first considering any explanations that the individual may provide*, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p (emphasis added); *see Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005) ("[T]he ALJ could rely on [the claimant's] non-compliance as long as he had first considered [the claimant's] explanations for her non-compliance."); *Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1097 (E.D. Wis. 2001).

Here, despite the fact that he heavily relied upon Mudd's failure to pursue treatment to discredit Mudd, the ALJ never asked Mudd at the hearing any questions about why he failed to pursue regular treatment, other than inquiring whether Mudd experiences side effects from his medication. (*See* Tr. 347.) Therefore, the ALJ failed to consider any explanations that Mudd may provide about his failure to pursue regular treatment and consistently take medication. *See Brown v. Barnhart*, 298 F. Supp. 2d 773, 797 (E.D. Wis. 2004) (stating that the ALJ "may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner"); *Brennan-Kenyon v. Barnhart,* 252 F. Supp. 2d 681, 697 (N.D. Ill. 2003) (remanding case where the ALJ failed to adequately develop the record

concerning the claimant's reasons for not seeking medical treatment); *Anderson v. Barnhart*, No. 01 C 5083, 2002 WL 314410, at *9 (N.D. Ill. Feb. 28, 2002) (same).

Nor is there any evidence that suggests the ALJ considered the explanations actually in the record for Mudd's failure to pursue regular treatment and consistently take his prescribed medications. *See Conner v. Barnhart*, No. 1:04CV0469-JDT-TAB, 2005 WL 1939951, at *5 (S.D. Ind. June 28, 2005) "[U]nder SSR 96-7p and related case authority, the ALJ has a duty to investigate reasons of non-compliance when determining the credibility of a claimant."). For example, in March 2002, Mudd reported to the VA that he had stopped taking Remeron, his anti-depressant, because he did not have the money to pay for it. (Tr. 158.) "Courts have regularly held that inability to afford treatment constitutes a good reason for not seeking it." *Neave v. Astrue*, No. 07-C0301, 507 F. Supp. 2d 948, 964 (E.D. Wis. Aug. 31, 2007) (collecting cases); *see Herron v. Shalala*, 19 F.3d 329, 336, n.11 (7th Cir. 1994) ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits.").

Also, in June 2004, Mudd explained that he stopped taking Remeron because he wanted to see how he could cope without it. (Tr. 230.) Indeed, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)); *see also Sparks v. Barnhart*, 434 F. Supp. 2d 1128, 1135 (N.D. Ala. 2006) ("Courts have long recognized the inherent unfairness of placing emphasis on a claimant's failure to seek psychiatric treatment[.]").

And, in March 2005 and January 2006, Mudd stated that he discontinued the Remeron

because of its side effects, stating that "he would be interested in an antidepressant if it did not make him feel sleepy and lazy." (Tr. 291-92.) While the ALJ inquired at the hearing whether Mudd experiences any side effects from his medication, he made no mention in his decision of the side effects that Mudd often complained of to his doctors and repeated at the hearing. *See, e.g.*, *Khan v. Chater*, No. 96 C 2872, 1997 WL 669764, at *4 (N.D. Ill. Oct. 22, 1997) (remanding ALJ's credibility determination where the ALJ inappropriately drew a negative inference about the severity of plaintiff's pain based on plaintiff's failure to take prescription medication, without considering plaintiff's statement that the prescription medication caused him adverse side effects).

Admittedly, as the Commissioner now asserts, Mudd's reasons for failing to consistently take his medication varied and there were times when he told his health care providers that he was having no significant mental problems. (*See, e.g.*, Tr. 228, 269, 277, 298.) Thus, the record certainly suggests that there may well be no good reason for Mudd's failure to consistently pursue treatment and that his mental impairment was simply not that severe.

Nonetheless, "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Indeed, "[t]he ALJ must be the one who specifies the reasons [for his credibility determination], not the Commissioner's lawyers." *Grieves v. Astrue*, No. 07 C 4404, 2008 WL 2755069, at *19 (N.D. Ill. July 11, 2008) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003)); *Steele,* 290 F.3d at 941 ("[T]he ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to [his]

conclusion." (citation and internal quotation marks omitted)); *Mirza v. Barnhart*, No. 00 C 8003, 2002 WL 731781, at *7 (N.D. Ill. Apr. 25, 2002) ("[T]he Commissioner's decision must stand or fall with the reasons set[] forth in the ALJ's decision."). Thus, we are not persuaded by the Commissioner's *post hoc* arguments.

It is important to note, of course, that the ALJ *also* reasoned in his credibility determination that Mudd's physical conditions were generally described as "mild and recently described as stable" and that the care for Mudd's back and knee problems was "conservative." (Tr. 16.) Nonetheless, it is obvious that the ALJ relied heavily upon Mudd's failure to follow treatment when making his credibility determination, and the VE testified that there would be no work for a hypothetical individual with the mental limitations that Mudd claims. (Tr. 360.) Thus the ALJ's failure to follow Social Security Ruling 96-7p cannot be definitively viewed as harmless in this instance. *See Craft v. Astrue*, 539 F.3d 668, 678-80 (7th Cir. 2008) (remanding the ALJ's decision where two of three reasons that the ALJ listed for his credibility determination were faulty); *Wadsworth v. Astrue*, No. 1:07-cv-0832-DFH-TAB, 2008 WL 2857326, at *9 (S.D. Ind. July 21, 2008) (concluding that the ALJ's failure to consider the plaintiff's explanation for not seeking medical treatment on a regular basis was not a harmless error, even though the ALJ provided "a detailed series of reasons for his finding"); *cf. Krontz v. Barnhart*, No. Civ. 1:01CV322, 2002 WL 32072796, at *9 (N.D. Ind. Mar. 26, 2002) (affirming the ALJ's decision where the plaintiff's failure to follow treatment was "simply an additional factor in the ALJ's credibility assessment" and the ALJ's credibility assessment did not "rest" on it).

In sum, the ALJ erred by discounting Mudd's credibility without first exploring why

Mudd failed to pursue regular treatment and consistently take medication. As a result, the case will be remanded so that the ALJ may reassess the credibility of Mudd's complaints in accordance with Social Security Ruling 96-7p.[7] *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) ("In evaluating the credibility of statements supporting a Social Security application, we have noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p.").

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this

---

[7] Mudd also contends that the ALJ failed to accurately reflect his findings regarding Mudd's mental limitations in the hypothetical that served as the basis for his step-five determination. (Opening Br. 10-12.) More particularly, the ALJ found that Mudd had a moderate limitation in social functioning and in his ability to maintain concentration, persistence, or pace. (Tr. 17.) Then, at step five, the ALJ posed a hypothetical question to the VE limiting Mudd to "simple, repetitive tasks that did not require working with the public." (Tr. 360.) Mudd acknowledges that the ALJ adequately accommodated his social limitations but argues that the ALJ failed to account for his limitations in maintaining concentration, persistence or pace.

Courts have held that when a medical source of record translates his findings into a particular RFC assessment, the ALJ may reasonably rely on that opinion in formulating a hypothetical question for the VE. *O'Connor-Spinner v. Astrue*, No. 4:06-CV-0171-DFH-WGH, 2007 WL 4556741, at *7 (S.D. Ind. Dec. 20, 2007) (quoting *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *4 (W.D. Wis. Mar. 2, 2005), *aff'd*, 175 Fed.Appx. 68 (7th Cir. 2006)); *see, e.g.*, *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (concluding that the ALJ's limitation to low-stress, repetitive work adequately incorporated the claimant's moderate mental limitations because the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that [the claimant] could still perform low-stress, repetitive work"); *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (concluding that the ALJ adequately captured the claimant's deficiencies in concentration, persistence, or pace in his RFC that limited the claimant to simple, repetitive tasks, in part because the state agency psychologist concluded in his functional capacity assessment that the claimant could sustain sufficient concentration and attention to perform simple, repetitive, and routine activity); *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (finding that the ALJ's limitation of plaintiff to work that is "routine and low stress" as recommended by one medical source of record adequately accounted for the fact that plaintiff "often" suffers from deficiencies in "concentration, persistence, or pace").

Here, the state agency psychologists expressly concluded that Mudd could perform "simple repetitive tasks on a sustained basis without special considerations" despite his moderate deficits in concentration, persistence, or pace. (Tr. 215, 221.) Thus, the ALJ reasonably relied upon that opinion in formulating his hypothetical question for the VE. Therefore, Mudd's second argument does not necessitate attention upon remand. (Opening Br. 11.)

15

Opinion. The Clerk is directed to enter a judgment in favor of Mudd and against the Commissioner.

SO ORDERED.

Enter for this 31st day of October, 2008.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge